**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DENVER A. CHAMBERLAIN,**

**Plaintiff,**

**vs.**                                                          **7: 13-CV -00065**

**CAROLYN W. COLVIN, Acting**
**Commissioner of Social Security,**

**Defendant**
_____

**THOMAS J. McAVOY**
**Senior United States District Judge**


## DECISION and ORDER

Plaintiff Denver A. Chamberlain this suit under § 205(g) of the Social Security Act ("Act"),

as amended, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security

("Commissioner") denying Plaintiff's application for supplemental security benefits.  Plaintiff

alleges that the decision of the Administrative Law Judge ("ALJ") denying the application for

benefits is not supported by substantial evidence and contrary to the applicable legal standards.  The

Commissioner argues that the decision is supported by substantial evidence and made in accordance

with the correct legal standards.  Pursuant to Northern District of New York General Order No. 8,

the Court proceeds as if both parties had accompanied their briefs with a motion for judgment on the

pleadings.

**I.      PROCEDURAL HISTORY**

Plaintiff applied for Supplemental Security Income benefits on September 25, 2006,

alleging disability as of July 19, 2006 based upon mental illness. (T. 168, 181, 185)  His

application was denied on December 8, 2006. (T. 13)  On January 29, 2007, Plaintiff filed a

written request for a hearing. (T. 13)  On July 2, 2008, Plaintiff appeared and testified at a

hearing in Norfolk, VA before ALJ William Vest, after which an unfavorable determination

was issued, dated October 23, 2008. (T. 88)  Upon Plaintiff's Request for Review, the Appeals

Counsel vacated the decision and remanded the case to ALJ Thomas P. Tielens. (T. 70, 85)

On March 18, 2010, Plaintiff appeared and testified at a video hearing before ALJ

Tielens, after which an unfavorable determination was issued, dated June 24, 2010. (T. 94-103)

On February 10, 2011, the Appeals Council vacated the hearing decision for a second time, and

remanded the case back to ALJ Tielens for further proceedings. (T. 138)

A second video hearing was held on July 5, 2011, after which an unfavorable

determination was issued, dated June 21, 2011. (T. 10, 13-25) Plaintiff timely filed his Request

for Review, and the Appeals Council denied review on December 17, 2012. (T. 6-8, 28)

## II.    FACTS[1]

### a. Medical Evidence

Plaintiff was born on September 5, 1963. (T. 168)  From January 7, 1999 to January 21,

1999, Plaintiff was admitted to the Benjamin Rush Center after his wife called 911. (T. 237)  He

believed his wife was having an affair and trying to kill him by putting birth control pills and arsenic

into his food. (T. 237)  He alleged that his wife was programming him and stealing his thoughts

away. (T. 239)  Plaintiff was placed in the Intensive Care Unit due to "totally psychotic, paranoid,

---

[1]The Commissioner  does not dispute the underlying facts as set forth by Plaintiff in his memorandum of law
and by the ALJ in his Decision. (T. 13-25)  The Court sets forth in this section only the facts marshaled by Plaintiff, and
discusses the additional facts addressed by the ALJ in the Discussion section.

[and] agitated" behavior and was described by Dr. Pradhan as having developed an "elaborate delusional system." (T. 237) Plaintiff was also described as being capable of "saying the right things" to be released from hospitalization. (T. 239) Dr. Pradhan diagnosed bipolar disorder, manic psychotic type, assigned a global assessment of functioning (GAF) score of 20[2] on admission, and noted that Plaintiff had been unable to hold a job for several years and "appear[ed] to be a danger to himself and others. (T. 240) Plaintiff was started on Depakote, Risperdal, and Haldol, and his dosages were increased until his mood began to stabilize. (T. 237)

In January 2002, Plaintiff was again admitted to the hospital due to increased paranoid thoughts about his girlfriend. (T. 255-256) He was admitted again from February 4, 2003 to February 10, 2003, presenting with thoughts of killing drug dealers who took his cab, which he saw as an easy way to improve society. (T. 252)

From October 2004 until April 2005, Plaintiff treated at the VAMC in Syracuse, NY. (T. 427-434) He complained to Dr. Aliya Hafeez on October 21, 2004, that he felt suicidal, and that he was thinking of overdosing on his Depakote. (T. 432-433) He was described as "very dysphoric," diagnosed with bipolar depression, and assigned a GAF score of 60.[3] (T. 433-34)

On April 4, 2005, Plaintiff told Dr. Alison Lentz, VAMC, that he was desperate and suicidal. (T. 428) He spoke with himself repeatedly and startled violently when he heard stray noises in the hall. (T. 429) He was described as suspicious and wary and talked about how he

[2]A GAF of 11 to 20 signifies "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute)." Diagnostic and Statistical Manual of Mental Disorders - IV-TR, p. 34.

[3]A GAF of 51 to 60 signifies "moderate symptoms (e.g., flat affect and circumstantial speech occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders - IV-TR, p. 34.

thought things had sinister double meanings. (T. 429) Following examination, Plaintiff was

escorted in handcuffs to Samaritan Medical Center ("SMC") for emergency involuntary psychiatric

care until April 19, 2005. (T. 343) He refused to sign the papers for a voluntary

admission due to suspicion about the hospital staff. (T. 343) He believed that the FBI and CIA

were following him. (T. 343) Plaintiff was diagnosed with major depressive disorder with

psychotic features and assigned a GAF score of 31.[4] (T. 343, 350) He was restricted to his unit as a

safety precaution and became more paranoid and aggressive after his admission. (T. 344) He was

started on Risperdal, but remained too psychotic to participate in therapy during his first

week of admission. (T. 344) Over the course of his stay his GAF improved to a 71,[5] and he was

discharged on Lexapro and Risperdal. (T. 344)

On May 4, 2005, Plaintiff was diagnosed with schizoaffective disorder, bipolar type by the

Syracuse VAMC. (T. 426) From May 9, 2005 to May 17, 2005, Plaintiff was again involuntarily

admitted to SMC, stating he "couldn't handle it anymore" and that his son was too aggressive and

could not be trusted. (T. 355) He was sad and depressed, had poor sleep and appetite, and was

assigned a GAF score of 31. (T. 355, 358) He was discharged on Lexapro, Risperdal, and Abilify.

(T. 356)

From June 27, 2005 to June 29, 2005, Plaintiff was hospitalized due to attempted suicide,

---

[4]A GAF of 31 to 40 signifies "some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and unable to work . . . )." Diagnostic and Statistical Manual of Mental Disorders - IV-TR, p. 34.

[5]A GAF of 71 to 80 signifies that "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational or school functioning (e.g., temporarily failing behind in schoolwork)." Diagnostic and Statistical Manual of Mental Disorders - IV-TR, p. 34.

presenting with multiple linear lacerations to his wrists bilaterally after drinking a bottle of Nyquil to numb his senses. (T. 368, 370) Dr. James Mead commented that it was unusual Plaintiff had failed to cause more serious injury to himself given the severity of his lacerations, which required 35 sutures. (T. 371) Later notes suggest resultant nerve damage. (T. 525) Plaintiff was diagnosed with bipolar disorder, depression, and borderline personality disorder. (T. 364) His Effexor prescription was restarted. (T. 371)

After his discharge, Plaintiff continued to treat at the Syracuse VAMC through August 2006. (T. 405) Over the course of his care, he attended therapy and had medication management. (T. 405-427) He described panic attacks, constant worry, and feelings of being overwhelmed. (T. 423) He continued to have suicidal thoughts. (T. 418)

On October 31, 2006, Dr. Jeanne Shapiro conducted a consultative psychological examination. She reviewed Plaintiff's subjective allegations and noted that he was relatively stabilized at the time of her examination. (T. 437) Plaintiff discussed his history of paranoid delusions, feeling that his co-workers were undercover CIA agents, and past thoughts that his girlfriend had been hired by his ex-wife's family and had microphones in her rings. (T. 436) When depressed, his symptoms were noted to include dysphoric moods, psychomotor retardation, crying spells, feelings of guilt, fatigue, loss of energy, feelings of worthlessness, diminished self-esteem, problems with memory, problems with concentration, and recurrent thoughts of death or suicide. (T. 436) When manic, his symptoms included inflated self-esteem, grandiosity, talkative and pressured speech, obsessive cleaning, psychomotor agitation, flight of ideas, elevated and expansive mood, decreased need for sleep, and excessive energy. (T. 436) Dr. Shapiro diagnosed bipolar disorder and schizophrenia (paranoid type), and concluded

that Plaintiff's capacity for work-related activities depended on him not being in a depressive or manic state. (T. 438) She opined that he could maintain attention and concentration "when he is not feeling too fatigued," make appropriate decisions "unless he is in a paranoid state," relate to others unless he was "paranoid or experiencing a manic or depressive episode," and deal with stress "at the present time, but not when he is experiencing psychiatric symptoms." (T.438)

Plaintiff was hospitalized from November 16, 2006 to November 28, 2006 after attempting suicide by ingesting 20 Ambien pills. (T. 514) Dr. Wendy Armenta noted that Plaintiff's paranoid delusional thinking had been "on and off" over the past two years. (T. 514-515) Plaintiff discussed the sexual abuse he suffered from the age of 8 to 12. (T. 515) During the admission, Plaintiff developed more paranoia and became upset by the notion that the nurses were talking about him and other patients; consequently, his Risperdal was increased. (T. 515)

On December 4, 2006, non-examining medical consultant Dr. Richard Altmansberger opined that Plaintiff had mild limitations in his activities of daily living; moderate limitations in his social functioning; moderate limitations in his concentration, persistence, and pace; and that he has had one to two episodes of decompensation. (T. 457) In the Mental Residual Functional Capacity Assessment, Dr. Altmansberger opined Plaintiff had moderate limitations in his abilities to accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest period. (T. 443-444)

Plaintiff continued treatment at the Syracuse VAMC from November 2006 through

August 2007, including therapy and medication management. During this time, he began treatment with VA psychiatrist Dr. T. Thomas Keller. (T. 523) Following initial assessment on May 8, 2007, which documented decreased concentration and fair to poor insight and judgment, Dr. Keller diagnosed schizoaffective disorder and a GAF score of 60. (T. 523-527). At the time, Plaintiff was driving a cab part time and planned on living in a tent through the month of June before moving to Virginia to be near his girlfriend. (T. 523)

On July 12, 2007, Plaintiff complained to Dr. Keller of increasing feelings of tiredness. (T. 520) He was fearful that something was happening to him and was having "bad thoughts" of putting out a lit cigarette on his arm. (T. 520) He expressed that the thought may have come from Satan, and described telling Satan to get out of his head. (T. 520) Dr. Keller diagnosed bipolar disorder and schizoaffective disorder, added Trazodone to Plaintiff's list of medications, and directed Plaintiff to continue with psychotherapy and pharmacological regime. (T. 519-520)

In September 2007, Plaintiff moved to Virginia where he began living at the Salvation Army and treating at the Hampton VAMC through April 2008. (T. 463-508) His diagnosis remained bipolar disorder and he continued on Depakote, Wellbutrin, and Risperdal. (T. 472) Plaintiff was hospitalized again from January 21, 2008 to January 24, 2008 after attempting suicide by overdosing on 30 to 90 pills, including Risperdal and Ambien. (T. 571) He was admitted to the Sentara Hampton Complex, where he remained for three days until he was sent to the Riverside Regional Crisis Center. (T. 581-582) On January 24, 2008, he was discharged after refusing continued hospitalization - he decided he did not need additional treatment and that he was ready to get back to work, telling the therapist: "God wants me alive because I have tried 3 times and have not killed myself." (T. 481)

On August 28, 2008, Dr. Randall Colker performed a consultative psychological examination. Plaintiff reported he lived in a tent in the woods, the government had forced him into poverty due to a big scheme, he could not afford the $8 per night to live at the Salvation Army, and he could not get along with the people there anyway. (T. 509) Plaintiff stated that the FBI and the mafia were following him, and the FBI had infiltrated the Salvation Army. (T. 510) He felt that his ex-wife had control over him and his mind. (T. 510) Plaintiff reported seeing and hearing demons that sleep with him and want to have sex with him. (T. 512) On examination, Plaintiff did very poorly on some questions, and Dr. Colker noted that it was worse than he would have expected for someone with a four year degree. (T. 511) On memory testing, Plaintiff made 2 errors after five minutes, but Dr. Colker (who has never treated or examined Plaintiff before) expressed that he was "not sure" if Mr. Chamberlain was exaggerating his deficit. (T. 511) Plaintiff did very poorly in arithmetic questions, made several errors in serial 7's, and his ability to think on an abstract level was fair to poor. (T. 511) Dr. Colker described Plaintiff's thinking as "inappropriate" in that he has a system of thinking in threes.[6] (T. 512) Dr. Colker felt that Plaintiff was having great difficulty functioning adequately, and noted that his reports did match up with the evidence contained in prior medical records. (T. 512) He concluded that Plaintiff did seem to be having delusions and hallucinations which are typical of paranoid schizophrenia and was demonstrating the irritability, impulsivity, and over-activity seen with bipolar disorder. (T. 512) Dr. Colker concluded that Plaintiff's prognosis was poor. (T. 513) Despite his noted uncertainty as to Plaintiff's exaggeration, Dr. Colker nonetheless opined:

---

[6] At the July 2, 2008 hearing Plaintiff described his "rule of three," stating that he knows that the FBI or CIA is involved whenever he finds three coincidences relating to a single occurrence in his daily life. (T. 881)

> Mr. Chamberlain may be incapable of completing very simple and repetitive tasks. It would be doubtful that he could do detailed and complex tasks. However, he probably would not be consistent in being at work and in performing activities. He would need much supervision, which it is very likely he would resent. Apparently, he has had much trouble getting along with supervisors, coworkers and the public. He would do poorly with the usual stressors in a work situation.

(T. 513) Dr. Colker diagnosed bipolar disorder and schizophrenic disorder, paranoid type and assigned a GAF of 35. (T. 512)

On July 2, 2008, Plaintiff appeared *pro se* and testified before ALJ Vest. He stated his only source of income and his primary daily activity was begging for money to pay his rent at the Salvation Army. (T. 878) Plaintiff said that he could no longer drive a taxi cab because he became too paranoid and had pulled a knife on one of his customers. (T. 879) He described his symptoms, noting that during episodes of depression he required multiple hospitalizations and had tried to kill himself several times; during episodes of mania, he was up for 30 hours at a time then slept for 10 to 20 hour stretches. (T. 880) He also described his paranoia, noting his fears of the FBI and mafia following him. (T. 881) He described his "rule of three," stating that he knows that the FBI or CIA is involved whenever he finds three coincidences relating to a single occurrence in his daily life. (T. 881) Plaintiff told ALJ Vest that Satan tempts him to give up and kill himself, and to be violent when things are peaceful. (T. 882) He described himself as "highly vigilant" and stated that he wants to kill crack dealers. (T. 882) Plaintiff recognized that he is a potential danger to others in the workplace due to his stress, anxiety, and paranoia. (T. 882) He said that he is unable to hold a steady job because he either gets tired, cannot maintain a schedule, or is overtaken by the stress. (T. 882) Vocational expert ("VE") Edith Edwards testified that an individual such as Plaintiff could perform simple, repetitive job tasks with low

stress and no frequent interaction with coworkers or the general public. (T. 884-885)

In October 2008, Plaintiff moved back to New York and resumed his treatment through the Syracuse VAMC and psychiatrist Dr. Keller. (T. 697) On December 11, 2008, Dr. Keller completed a Medical Assessment of Ability to do Work-Related Activities. (T. 586-587) He concluded that Plaintiff has marked difficulties in his ability to make judgments on simple work related decisions, and extreme difficulties in his ability to: understand and remember or carry out instructions; interact appropriately with the public, supervisors, or co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. (T. 586-587)

On December 12, 2008, Dr. Keller observed depressed and flat affect, poor insight, and poor judgment. (T. 697-698) Plaintiff's perceptual disturbances were "paranoid, uncomfortable around people in work settings, fears from past experience that people will try to kill him." (T. 698) Dr. Keller concluded that Plaintiff appears unable to keep gainful employment, noting "[e]ven in the past when he was more or less on medication ... he could not keep a stable place to live or employment." (T. 697) Dr. Keller diagnosed schizoaffective disorder and bipolar disorder NOS and assigned a GAF score of 40. (T. 698) Plaintiff was prescribed Effexor, Depakote, and Risperdal, and instructed to reestablish psychotherapy. (T. 691) In the Suicide Risk Assessment, Dr. Keller noted "significant ongoing suicide risk." (T. 696)

At his December 23, 2008 psychotherapy session, Plaintiff presented with chronic schizoaffective symptoms. (T. 694) His delusions included having a "storyline" going in his mind, being paranoid without reason, and social and familial conflicts. (T. 694)

Despite Plaintiff reporting an improvement in his mental symptoms when not

working and under less social pressure, the examiner at his March 3, 2009 psychotherapy session observed him to ramble and exhibit paranoia, even though unemployed at the time. (T. 690) On March 20, 2009, Plaintiff complained to Dr. Keller of auditory hallucinations and paranoia, and felt he "would be a danger to others in the workplace." (T. 689) Despite an increase in Risperdal dosage, on May 1, 2009, Plaintiff reported hearing voices and paranoia, albeit lessened. (T. 678)

From September 12, 2009 to September 23, 2009, Plaintiff was hospitalized at SMC. He told the police he was thinking of killing his son and himself, although afterward he claimed he "didn't think he really meant it." (T. 589, 667) During hospitalization, Plaintiff continued to have homicidal and suicidal ideation and described a hallucination in which the floor looked like waves and was moving and fuzzy animals were coming out of the water (the floor). (T. 603) Plaintiff was discharged to DSS emergency housing as his mother was no longer willing to permit him to live with her. (T. 667) At discharge, Plaintiff's insight and judgment remained fair, and his GAF score was 65.[7] (T. 590)

By October 2, 2009, Plaintiff's GAF score had regressed to 48.[8] (T. 669) On November 19, 2009, Plaintiff reported to Dr. Keller that he had been experiencing flashbacks wherein he would hear his own voice asking for help and that his sleep was poor. (T. 661)

On February 2, 2010, Dr. Keller completed a second Medical Assessment of Ability to do Work-Related Activities, concluding Plaintiff has marked restrictions in his ability to understand

---

[7]A GAF of 61 to 70 signifies: "Some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders - IV-TR, p. 34.

[8]A GAF of 41 to 50 signifies: "Serious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders - IV-TR, p. 34.

and remember or carry out simple instructions, and extreme restrictions in his ability to make judgments on simple work related decisions; understand and remember or carry out detailed instructions; make judgments on complex work related decisions; interact appropriately with the public, supervisors, or co-workers; and respond appropriately to usual work situations and to changes in a routine work setting. (T. 638-639) Dr. Keller opined that Plaintiff's "diagnosis of schizoaffective disorder impairs his ability to function in public or work setting," and noted increased anxiety and paranoia. (T. 639)

On March 18, 2010, Plaintiff appeared and testified at a video hearing before ALJ Tielens. He testified that he worked "off and on" part-time from 2006 through October 2008, making an average of $120/week when he was working. (T. 824) He acknowledged that he had previously lied about work in order to get benefits and that he lied and exaggerated to the consultative examiner (Dr. Colker) but was now "coming clean," admitting his lies and testifying truthfully. (T. 826, 850) Plaintiff testified that his work as a customer service representative for Stream ended because of his paranoia that the CIA and FBI were listening to his calls. (T. 827) He testified that he believed his wife was sending the mafia after him and that when he was arrested in 1997, he talked to the walls because he thought they were bugged. (T. 830) He testified that during the approximately one year he lived at the Salvation Army in Virginia he had conflict with others and got into fights. (T. 837) Plaintiff testified that he had been arrested for rape and that he "lashed out at a lot of people." (T. 830, 844) The ALJ did not elicit further testimony regarding Plaintiff's limitations.

Medical expert Dr. Louis Lauro testified via telephone at the 2010 hearing despite not having been provided with the complete medical evidence of record and thus was unfamiliar with

the opinions of Plaintiff's treating physicians over the past two years, information which Dr. Lauro testified would be important for him to have. (T. 857)  From the information he did have, Dr. Lauro's primary diagnosis of Plaintiff was personality disorder; his secondary diagnosis was a mood disorder.  (T. 852)  Dr. Lauro opined Plaintiff exhibited criteria (2), (4), and (5) of Listing 12.08(A): maladaptive patterns of behavior associated with pathologically inappropriate suspiciousness or hostility; persistent disturbances of mood or affect; and pathological dependence, passivity, or aggressivity.  (T. 852)  Considering the "B" criteria of Listing 12.08, Dr. Lauro opined marked limitation in social functioning "is certainly present."  (T. 855)  Dr. Lauro opined Plaintiff had "less than marked" difficulties in the other three criteria, noting the limitations in activities of daily living and concentration were "quite variable."  (T. 855)  VE Esperanza Distefano also testified at the hearing.  The VE testified that someone with the claimant's age, education, and past work experience with extreme limitations in the areas of interacting appropriately with the public, supervisors, and co-workers and responding appropriately to changes in the work setting and work pressures, would not be able to perform any jobs that exist in significant numbers in the national economy. (T. 868-869)

Plaintiff continued treatment through the VA in Syracuse, and on November 16, 2010, began treatment with VA psychiatrist Jeffrey Aronowitz.  (T. 727)  During the mental status examination, Plaintiff's "thought content reveal[ed] paranoia," and Dr. Aronowitz's assessment was schizoaffective disorder-symptomatic.  (T. 730)  Plaintiff sought care on December 8, 2010, reporting he had not felt well enough to work since Friday December 3 due to difficulty sleeping. (T. 723)  He reported auditory hallucinations and that he believed a female co-worker was actually a member of the CIA. (T. 723)  Similarly, on December 16, 2010, Plaintiff reported he

13

believed his employer was an outpost for the CIA and his co-workers had been planted there to monitor him and report back to the government. (T. 719)

Plaintiff reported to Dr. Aronowitz on March 31, 2011, that he was looking for employment "but feels his options are limited by his paranoia and erratic sleep pattern," and "[o]verall, he does not feel well enough to work at this time." (T. 702) Dr. Aronowitz completed a Psychiatric Report for Employment Activities in which he opined Plaintiff was diagnosed with schizoaffective disorder and was unable to participate in work or work activities but had the potential to recover sufficiently to return to work; the recommended treatment was medication management and vocational rehabilitation. (T. 735)

### b. Hearing before the ALJ

At the hearing before ALJ Tielens on July 5, 2011, Plaintiff testified that he had worked for Stream, a call center, from September 2010 through December 2010, when the contract he was hired to work on ended. (T. 772) During those four months, he missed 13 or 14 days of work because of his sleep pattern. (T. 775, 784) Plaintiff explained that he would stay up for 1.5 -2 days, go to work, and end up "crashing" and having to go home early. (T. 784) For instance, the night before the hearing he had gone to bed at 9 pm and slept until noon, but prior to that had been up since 4 pm the afternoon before. (T. 784-785) He testified that he had been able to drive a taxi cab despite his sleep pattern because the job was flexible and he could call in when he wanted to work; even then, there were periods when he would just not show up for work. (T. 786) Plaintiff also testified that he has a fear of being robbed. (T. 788-789) Plaintiff thought a co-worker at Stream was connected to the CIA due to her mention of the base at which he served his four years in the U.S. Military. (T. 789) He stated that his paranoia "comes and goes." (T. 791)

14

Plaintiff testified that he applied to work at Stream but has not been rehired. (T. 775) He filed income tax returns for 2004-2006, when he had worked for Stream, but had not filed for 2007 to 2009. (T. 776) He did not work in 2008 or 2009; he worked driving taxi cab in 2007, but was under the "misguided impression" that he could not work and simultaneously apply for Social Security benefits and, consequently, worked "under the table." (T. 776) ALJ Tielens cited VA records which stated that Plaintiff leased a taxi for $500 per day and makes a decent living. (T. 777) Plaintiff asserted the note was incorrect, asking ALl Tielens "Can I give you the right price?" to which ALl Tielens replied "No, because it won't make any difference." (T. 777) Plaintiff also testified that if you are in a mental institution and want to get out, you have to "play the game," "pretend to be normal," and tell doctors what they want to hear. (T. 779)

Medical expert Dr. Louis Lauro again testified at this hearing, opining that Plaintiff has a personality disorder and that the other diagnoses, "depression and so on," are subordinate. (T. 795) As to schizoaffective conduct and paranoia, Dr. Lauro testified that "the conduct is there" but it overlaps with the personality disorder and is maladaptive. (T. 798) Dr. Lauro opined that Plaintiff "runs into problems" and gets depressed because of his maladaptive behavior. (T. 800) Dr. Lauro also opined that Plaintiff has moderate limitations in his activities of daily living, social functioning, and concentration, persistence and pace, and "some" episodes of decompensation. (T. 795-796) He commented that Plaintiff is able to pull himself together and function for a while, and then stops functioning - his problems are intermittent. (T. 798) As to recommended treatment, Dr. Lauro testified that medication can keep personality disorder "under some degree of control" but that it cannot be treated with regular psychotherapy and, rather, the person has to be guided. (T. 802) Dr. Lauro opined that the VA and social services agencies were keeping Plaintiff grounded. (T. 802)

15

VE Distefano also testified again at the hearing.  The ALJ asked her, in hypothetical form, if there would be any work that a claimant with Plaintiff's age, education, and past work could perform, assuming he was limited to simple, repetitive work and limited interactions with others. (T. 804-805)  She stated that such a person could work as a laundry worker (SVP: 2) or vehicle washer (SVP: 1), and provided availability statistics as to these jobs.  (T. 804-805)  Ms. Distefano opined that missing more than three days of work per month "would endanger maintaining employment."  (T. 806)  She opined that whether having a lapse in concentration for 30 minutes in an 8-hour workday would exceed the tolerance depends on the employer.  (T. 809)  She further opined that having a lapse in concentration for 10 minutes every hour would not be tolerated by an employer; but that if the employee was compensating for the off-task time when working, it "would be perfectly acceptable to the employer" and she does not believe it would endanger employment. (T. 811-812)  Ms. Distefano further testified that the tolerance for being 10 minutes late once per week or leaving early "would really depend on the employer." (T. 813)

## III.    THE ALJ's DECISION

On June 5, 2011, the ALJ issued his unfavorable decision. (T. 13-25)  The ALJ found at step one of the sequential evaluation that Plaintiff had not engaged in substantial gainful activity since September 25, 2006, his application date, except for a period from September 2010 through December 2010 (T. 16).  The ALJ found at step two that only Plaintiff's personality disorder was a severe impairment (T. 16-18).  Next, at step three, the ALJ found that Plaintiff's personality disorder and his symptoms did not meet or equal the requirements of an impairment contained in the Listing of Impairments set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1 (T. 18-19).  In so doing, the ALJ specifically considered Listing 12.08.  (T. 18-19)   The ALJ found Plaintiff to have

only moderate restrictions in the areas of daily living, social functioning, and concentration, persistence and pace. (T. 18-19)

At step four, with the testimony of a vocational expert, the ALJ found that Plaintiff could not perform his past relevant work. (T. 23) Nevertheless, at step five, the ALJ determined that given Plaintiff's RFC along with his age, education, and work experience, Plaintiff could perform other work existing in significant numbers, including laundry worker and vehicle washer, as identified by the vocational expert. (T. 23-25) In this regard, the ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels and engage in simple, repetitive work with limited interaction with the general public, supervisors, and co-workers. (T. 19-23) The ALJ found that jobs exist in significant numbers in the national economy that Plaintiff could perform, including laundry worker and vehicle washer. (T. 24) Thus, the ALJ determined Plaintiff was not disabled since September 25, 2006. (T. 25)

IV.     **APPEALS COUNCIL REVIEW & INSTANT ACTION**

On December 17, 2012, Plaintiff's Request for Review was denied by the Appeals Council. (T. 6-8, 28) This action followed.

V.      **STANDARD OF REVIEW**

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he

has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do."  The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)(quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002))(internal citations omitted).

The Court's review of the Commissioner's determination is limited to two inquiries.  *See* 42 U.S.C. § 405(g).  First, the Court determines whether the Commissioner applied the correct legal standard. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998); *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990); *Shane v. Chater*, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler, J.)(citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. *See Tejada*, 167 F.3d at 773; *Balsamo*, 142 F.3d at 79; *Cruz*, 912 F.2d at 11; *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).  A Commissioner's finding will be deemed conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Perez*, 77 F.3d at 46; *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled.  The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted).  In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197,

229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)).  Where the record supports disparate findings and

provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing

court must accept the ALJ's factual determinations. *See Quinones v. Chater*, 117 F.3d 29, 36 (2d

Cir. 1997)(citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)); *Alston v. Sullivan*, 904 F.2d

122, 126 (2d Cir. 1990).  However, although the reviewing court must give deference to the

Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a

remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'"

*Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990)(quoting *Rivera v. Schweiker*, 717 F.2d 719,

723 (2d Cir. 1983)).

## VI.    DISCUSSION

### a.  Bipolar Disorder and Schizophrenia as "severe" Impairments

The Plaintiff argues that the Commissioner erroneously failed to find at step two that

Plaintiff's bipolar disorder and schizophrenia are "severe" impairments.  The Commissioner argues

that substantial evidence supports the ALJ's determination that  Plaintiff's bipolar disorder and

schizoaffective disorder were not severe impairments.  The Commissioner further argues that, even

if the ALJ erred in this regard, it is harmless because he found Plaintiff's personality disorder to be a

severe impairment and proceeded with the sequential evaluation beyond step two.

> At step two, a claimant has the burden of establishing that [he] has a "severe
> impairment," which is "any impairment or combination of impairments which
> significantly limits [his] physical or mental ability to do basic work activities." 20
> C.F.R.§ 404.1520(c); *see Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.
> 2003).  As pertinent here, basic work activities are "the abilities and aptitudes
> necessary to do most jobs," including: "[p]hysical functions such as walking,
> standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," as well as
> "[u]nderstanding, carrying out, and remembering simple instructions; [u]se of
> judgment; [r]esponding appropriately to supervision, co-workers and usual work

situations; and [d]ealing with changes in a routine work setting." 20 C.F.R.§ 404.1521(b) (1), (3)-(6).

*Chavis v. Colvin*, No. 5:12–cv–1634, 2014 WL 582253, at *2 (N.D.N.Y. Feb. 13, 2014).

While "[t]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe," *Bergeron v. Astrue,* No. 09–CV–1219, 2011 WL 6255372, at *3 (N.D.N.Y. Dec. 14, 2011)(quoting *McConnell v. Astrue,* No. 6:03–CV–0521, 2008 WL 833968, at *2 (N.D.N.Y. March 27, 2008)), "[a] finding of not severe may be made if the medical evidence establishes *only* a 'slight abnormality' that would have 'no more than a minimal effect on an individual's ability to work.'" *Zedanovich v. Commissioner of Social Sec.*, No. 3:06-CV-1403, 2009 WL 577763, at *9 (N.D.N.Y. March 04, 2009)(quoting *Rosario v. Apfel*, 1999 U.S. Dist. LEXIS 5621, *14, 1999 WL 294727 (E.D.N.Y. March 19, 1999))(emphasis added). "The severity analysis at step two may do no more than screen out *de minimis* claims." *Comparetto v. Colvin*, No. 3:11-CV-1514, 2013 WL 1193353, at *3 (N.D.N.Y., March 22, 2013)(citing *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)) .

An ALJ's evaluation of a claimant's mental impairments must reflect his application of the "special technique" set out in 20 C .F.R. § 404.1520a, which necessitates his consideration of "four broad functional areas" that include: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). The first three areas are rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." *Id.* § 404.1520a(c)(4). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the [ALJ] generally will conclude that the claimant's mental impairment is not 'severe.'" *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir.2008) (quoting 20 C.F.R. § 404.1520a(d)(1)). If the claimant's mental impairment is deemed severe, the ALJ must determine [at step three] whether the impairment meets or equals the severity of a mental disorder listed in section 12.00 of the Listing of Impairments in 20 C.F.R. part 404, subpart P, appendix 1. *See* 20 C.F.R. § 404.1520a(d)(2). The mental RFC assessment used at steps four and five of the sequential evaluation process requires the ALJ to, among other things,

engage in a more detailed assessment of various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in section 12.00 of the Listing of Impairments. *See* SSR 96–8p, 61 Fed.Reg. 34,474, 34,477 (July 2, 1996).

*Charlton v. Commissioner of Social Sec.*, No. 7:12-CV-580, 2013 WL 2403844, at *2 (N.D.N.Y., May 31, 2013); *see also Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)(The Commissioner has promulgated additional regulations that require application of a "special technique" at the second and third steps of the five-step framework)(citing 20 C.F.R. § 404.152(a)). "[A]pplication of the special technique [must] be documented." *Petrie v. Astrue*, 412 Fed. App'x 401, 408 (2d Cir. 2011) (citing 20 C.F.R. § 404.1520a(e)). "Pursuant to the regulations, the ALJ's written decision must 'reflect application of the technique, and ... include a specific finding as to the degree of limitation in each of the [four] functional areas.'" *Id*. (quoting 20 C.F.R. § 404.1520a(e)(2)).

Here, the ALJ found at step two that Plaintiff's only severe impairment was his personality disorder. The ALJ reached this conclusion because: (1) psychiatric consultant Dr. Altmansberger

> opined that the claimant's previous diagnosis of schizophrenic disorder was incorrect, and that the claimant reported improvement with treatment. He also noted that the claimant engaged in "full" activities of daily living, including "cleaning, laundry, goes out alone, drives a car, shopping, managing money, and reports [that he] can follow instructions. Dr. Altmansberger added that the claimant's mental status examinations were frequently normal. (T. 17);

(2) Louis Lauro, Ph.D., an impartial medical expert, testified that Plaintiff's "primary diagnosis" is personality disorder. (R 17) Dr. Lauro also pointed out that Plaintiff's "depression, anxiety, and paranoia do not qualify as diagnoses on their own, but that some elements of these symptoms appear as part of the claimant's personality disorder. Dr. Lauro also testified that he believed that the claimant's diagnosis of schizoaffective disorder was not appropriate." (T. 17). The ALJ also pointed out that Dr. Lauro "noted that personality disorder encompasses maladaptive

personality traits and that this covers all of the claimant's reported symptoms and behaviors.  Dr.

Lauro frequently described the claimant's symptoms as 'moderate' or 'intermittent.'" (T. 17); and

(3) "All other alleged impairments are non-severe because they did not exist for a continuous period of at least twelve months, were responsive to medication, did not require any significant medical treatment, or did not result in any continuous exertional or non-exertional functional limitations." (T. 17).

However, the ALJ did not make  specific findings in his step two analysis as to each of the four broad functional areas discussed above.  Moreover, the record demonstrates that Dr. Keller diagnosed schizoaffective disorder on May 8, 2007 and bipolar disorder on July 12, 2007, and these diagnoses continued throughout treatment. (T. 520, 523-527, 698, 694)  On March 31, 2011,  Dr. Aronowitz diagnosed schizoaffective disorder and personality disorder NOS.  (T. 735)  Examining physicians Dr. Shapiro diagnosed bipolar disorder and schizophrenia (paranoid type) on October 31, 2006,  and Dr. Colker diagnosed bipolar disorder and schizophrenic disorder (paranoid type) on August 28, 2008. (T. 438, 512)  Further, the record reflects that Plaintiff has been hospitalized nine times, at least five of which were involuntary, for his psychotic, paranoid, and agitated behavior as well as delusions, suicide attempts, and suicidal and homicidal thoughts.  In addition, he appears to have had marked difficulties in his work life, social interactions, and living arrangements.  Thus, there was evidence in the record supporting a conclusion that Plaintiff may have had marked limitations in each of the four broad functional areas caused by a schizoaffective disorder or a bipolar disorder.  *See Santiago v. Colvin,* No. 12 CIV. 7052,  2014 WL 718424, at *7 (S.D.N.Y., Feb, 25, 2014) ("At Step Two, the ALJ found that [plaintiff] suffered from bipolar disorder, which is a 'severe impairment' under the Regulations.").   While the ALJ proceeded in step three to Listing

12.08 with regard to Plaintiff's personality disorder and addressed the evidence related to the four functional areas, his failure to specifically address Plaintiff's degree of limitations in the four functional areas potentially related to Plaintiff's schizoaffective disorder and bipolar disorder in step two prevents meaningful review of the ALJ's determination.

It is well recognized that the omission of an impairment at step two may be deemed harmless error, particularly where the disability analysis continues and the ALJ later considers the impairment in Plaintiff's RFC determination. *See Tryon v. Astrue,* No. 5:10–CV–537, 2012 WL 398952, at *4 (N.D.N.Y. Feb. 7, 2012). However, the result of the step two analysis potentially deprives Plaintiff of consideration under Listing 12.03 (Schizophrenic, Paranoid, and Other Psychotic Disorders) at step three. While the ALJ may ultimately have reached the same conclusion regarding Plaintiff's alleged disability had he considered that Plaintiff's bipolar disorder and schizophrenic disorder as severe impaiments, the five-step sequential evaluation is a process in which each subsequent step is impacted by the conclusions reached at the former steps.

By failing to delineate his findings as to the special technique at step two regarding Plaintiff's bipolar disorder and schizophrenic disorder, Plaintiff was denied a proper review of his claim under the Act. Consequently, the matter must be remanded for further proceedings. *See Charlton*, 2013 WL 2403844, at *3 ("[T]he ALJ's error [at step two] requires remand inasmuch as the court cannot meaningfully review the determination. Notably, at least some evidence in the record indicates that [plaintiff's] limitations were more than mild.")(citing *Kohler v. Astrue*, 546 F.3d 260, 267–69 (2d Cir. 2008)). Because the Court finds that the matter must be re-evaluated

from step two, it refrains from reaching the remaining issues presented by Plaintiff.[9] *See id.*

("Because the error occurred at step two of the ALJ's analysis, the court is unable to reach Charlton's other contentions, which allege errors at later steps in the disability evaluation.").

## VII.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED, and the Commissioner's motion for judgment on the pleadings is DENIED. The decision of the Commissioner is REVERSED and this case is REMANDED, pursuant to sentence four of 42 U.S.C. § 405(g), for a determination consistent with this Decision and Order.

**IT IS SO ORDERED.**

Dated:March 27, 2014

Thomas J. McAvoy
Senior, U.S. District Judge

---

[9]Plaintiff contends:

l.  The Commissioner erroneously failed to find that Plaintiffs bipolar disorder and schizophrenia are "severe" impairments;

2.  The Commissioner erroneously failed to find Plaintiff suffers from a listing-level intellectual deficit and meets Listings 12.03 and 12.08;

3.  The Commissioner erroneously failed to properly calculate Plaintiff's residual functional capacity and failed to give controlling weight to the opinions of treating medical providers; and

4.  The Commissioner erroneously failed to support with substantial evidence his conclusion that there is significant work in the national economy that Plaintiff could perform.

The Commissioner opposes each of these arguments.